The next matter, number 191746, David Carson et al. v. A. Pender Makin Good afternoon, your honors. Tim Keller on behalf of the appellant parents meets me at council table. Zarif Pandju and Leah Patterson also on behalf of the appellant parents. I would like to reserve three minutes for rebuttal. You may. The parents here, like the parents in Hewlett, in light of significant and recent U.S. Supreme Court precedent, are asking this court to reconsider its prior precedent. Specifically, under Trinity Lutheran, we believe that it is now clear that the government may not exclude religion wholesale from a generally available benefit program. You say, and you say frequently in your brief, that the religion that is excluded is wholesale. What do you make of the answer that I gather it was the prior commissioner, Hassan, made to the effect that the practice of the department itself is to require not merely that an ineligible grantee be a religious organization, but in addition to that, be a religious organization that engages in some kind of religious advocacy or teaching function for the purpose of, in effect, inculcating religion. And that is not wholesale. That is religion plus. And your whole argument seems to be premised on treating the main rule as a religious wholesale rule, which in its administration, apparently it is not. I believe it is, in the sense that, under the way you phrased your question, I believe you suggested that a quote-unquote religious school that did not inculcate religious beliefs could participate in the program. And I don't believe that's true. But here's the testimony from the main superintendent that indicates that would be true. Please describe how you interpret the language non-sectarian school. He says, in making its determination whether a particular school is in compliance with section 2951, the department considers a sectarian school to be one that is associated with a particular faith or belief system in which, in addition to teaching academic subjects, promotes the faith, while affiliation or association with a church or religious institution is one potential indicator of a sectarian school. It is not dispositive. The department's focus is on what the school teaches through its curriculum and related activity and how the material is presented. Well, Your Honor, it sounds to me that if that is indeed the position of the current commissioner, that that position itself would violate the establishment clause, because it is preferring one type of religion over another. And that's explicitly excluded. Which religion is it preferring? The benefit that Maine is offering is a publicly funded secular education. The commissioner is just saying, we're going to look at your curriculum, even if you, the institution, have a religious identity, we're going to look at your curriculum to see if the education that you offer meets our secular requirements or whether it inculcates your religious beliefs. Well, Your Honor, there's no dispute here that the schools that my clients wish to attend, using the tuition benefit, satisfies the state's curricular requirements, the basic educational requirements. There's nothing in the record that indicates that their curriculum, leave aside the fact that they are religiously sponsored, there's nothing that indicates that their curriculum as currently constituted would qualify under that description that the superintendent has given, which is the description of record in this case. Well, Your Honor, there was no deposition. They've never applied, and therefore we don't know. There was no deposition of the superintendent in this case. That is not part of this record, and what the statute requires in order for a school to apply to receive the tuition benefit. Imagine, I take it you might say there's a record dispute. If the record were that non-sectarian accordance with the First Amendment were construed as I just read you, I guess it's the former commissioner, stated it is understood, what would be left of your position? The entire position, Your Honor, because we've also brought an Establishment Clause claim, and I believe that under the Establishment Clause, the government cannot favor one religion over another. They can't say that because this particular school takes its religion seriously and actually tries to inculcate the values of our religious faith into the students at our school, they're precluded, but another school that is religiously affiliated What precedent do you have for that? I think the Tenth Circuit's decision is the most persuasive on this point. Judge Michael McConnell in that issue said that in the case of Colorado Christian University, the state could not exclude what they called pervasively sectarian schools in favor of sectarian schools because that is a form of religious discrimination that would violate the Establishment Clause. The precedent in this circuit, of course, is Hewlett does contain an Establishment Clause holding, and the very last sentence of that holding is something like, in all events, we are aware of no precedent holding that a scheme which does not prefer any religion at all can violate the Establishment Clause. But, Your Honor, I think that precedent is now on the books in the form of Trinity Lutheran. Well, I don't think it is. I think that's maybe a block, and I don't think Trinity Lutheran, the Trinity Lutheran Court, as I read it, went to great pains as a court to disassociate itself from that position and to hold that religious identity or status as a criterion can work a violation of the Free Exercise Clause, but the situation that's posed to you by Judge Barron is one in which it's not religious identity or status which is posed as the determining criterion, but the content of the benefit. Your Honor, what the Supreme Court said in Trinity Lutheran was that laws that target the religious for special disabilities based on not only religious status, which is what you focused on in your question, but also religious conduct or religious beliefs trigger strict scrutiny, particularly in the context of the sort of generally available benefit program that exists here in Maine. But you have to first define the benefit. Right, and I don't believe Trinity Lutheran allows the ULIT definition of a secular education to stand. Well, what if it says it doesn't? Because if you can simply redefine the benefit as, this is only for secular. I understand the idea of Trinity Lutheran potentially calling into question ULIT insofar as it's a status-based restriction, because the benefit would be arguably any qualifying educational curriculum. And then the only people ousted are because of their religious status. So then we'd have to deal with, well, what's the significance of the footnote in Trinity Lutheran? But we don't get to that question if the restriction's not status-based and is instead based on the content of the instruction. You might have an argument of the kind you're making as to why you should nonetheless win, but ULIT resolves that question. And nothing in Trinity Lutheran, as I read it, suggests in that circumstance that there's a constitutional problem. Well, Your Honor, I disagree that there's a binary choice between status and use. It's not just whether this is status-based discrimination. Trinity Lutheran is clear that through exercise of cause also triggers scrutiny when laws burden religious conduct and religious beliefs. Here, there's no doubt that the conduct that my clients are engaging in is religious conduct. And I believe Trinity Lutheran does limit the broad reading that this Court and ULIT gave to Locke. Because if it didn't limit that decision, clearly Locke or Trinity Lutheran itself would have come out differently because it would have sanctioned the wholesale exclusion of religion from the program at issue there. Counsel, before your time runs out, I simply want to call to your attention that you may have a threshold problem here. I'm seriously concerned about whether we have Article III standing to hear this appeal in the first place. Your Honor, I expect to address a lot of that in my rebuttal, but I think ULIT is unquestionably the best case we have when it comes to standing. The Article III standing question that's raised here was not raised in ULIT. It was addressed explicitly in ULIT. No, a standing question was raised. But in ULIT, the question that was raised is whether the plaintiffs on a use tertiary theory could assert the right of the school. Here, we've got a record not suggested in ULIT, where the record suggests that there is no school which will currently apply for this benefit no matter how Maine construes the statute. So long as Maine sticks to its criterion that fair employment practices must govern all recipients. Would you like me to respond now or wait until my time? I'd like you to respond now. All right, thank you. Your Honor, in ULIT, the Court specifically noted that parents in and of themselves had standing and noted two relevant facts with regard to redressability. Number one, that the schools may not want to participate in the program at all because of concomitant state regulations that may apply to them. And number two, in that case, the citizens were from the town of Minot, which only permitted up to 10% of the students to apply for the tuition benefit, and only if the district itself permitted them to receive it, if they could demonstrate that the public school they contracted with did not meet their educational needs. Those two things go directly to the same issues of redressability that are brought up here by my friends at the State. Thank you. Peter Police, the Court. A vague story for the United States. I'd like to begin by explaining why the State of Maine's interpretation of its policy that's been advanced so far in this case is actually distinct from the way they've applied it in the past, as borne out by the record in this case. And then after I do that, explain why that's clearly unconstitutional under Trinity Lutheran, I'd like to turn to why even the version of the policy they have defended in this case is also a violation of Trinity Lutheran. I would draw the Court's attention to Exhibit 2 of the stipulated record, which is at pages 12 to 14, which is a discussion of an application by what is described as a school with an Episcopalian tradition, but that does not have a curriculum that is influenced by the Episcopalian church. The State of Maine declined to provide funding for that school, and here's the explanation that was provided. Quote, nonsectarian is defined as, internal quotes, not affiliated with or restricted to a particular religious group, close internal quotes. The Kent school mission statement clearly indicates an affiliation with the Episcopal church. Therefore, we are unable to approve the school for receipt of public funds. So what they're looking at is just, do you say in your mission statement you are associated with the church? But what do we do with the fact that the records mix them up? They also, in the Codman, I think this was the Codman Mountain School application, they inquired into what's the nature of the chapel requirement, which is inconsistent with your position. It's clear that the State of Maine has applied its own requirement inconsistently, and so if you want to look at what the Maine Supreme Judicial Court has said, rather than at what the commissioner has done in different cases, we could look at that instead. I draw the court's attention to Bagley against Raven School Department. This is in 1999. Here's what the Maine Supreme Judicial Court said. The tuition statute explicitly excludes only those private schools with religious affiliations. And later, in the same opinion, it does not place any restrictions or limitations on the use of the funds or the content of the course offerings. So I think it's quite clear, if you look at what the Maine officials have done in at least some past instances, and at what the Maine Supreme Judicial Court has said, that this is a restriction on what the nature of the institution might be. But in a case of that kind of inconsistency, in which there certainly are examples in which they have taken what I call a religion-plus position, aren't we entitled to decide the case on the basis of the Hassen Statement, which is uncontradicted, not qualified in the record by the Maine Department, and go on that basis? First, I think it is contradicted by the other evidence from the record that I've just recited. But second, let's put all that evidence aside and concentrate solely on that statement. I'm happy to explain why we think that, too, would violate Trinity Lutheran, although we acknowledge that that's a harder case, and especially given Hewlett on the books, we might be pushing at the edges of what we can extract out of Trinity Lutheran in that circumstance. But I'd say even with the policy as now described by the state, there are at least two problems. The first is that they're still saying that religious affiliation is taken into account as a negative factor against the institution. It's a potential indicator. It doesn't say negative factor. It's a potential indicator that can lead to the disqualification of that institution from receiving benefits. So at least to that extent, we think it is unconstitutional. But in addition, when they say the department considers a sectarian school to be one that is associated with a particular faith or belief system, and which, in addition to teaching students academic subjects, promotes the faith or belief system, I think that would sweep in a school that, for instance, taught math, science, social studies, and English throughout the day, and that at the beginning of the day had school prayer, and at the end of the day was engaging in secular instruction. Why isn't that just the difference? That's just not within the scope of the benefit. I agree that that kind of circumstance where the institution is providing a secular education with some religious elements is going to get us to the edge of that status use line that the Supreme Court has drawn. But I think the best place to look for why the antiestablishment interests can't outweigh the interest in avoiding that religious element, it doesn't have to be an antiestablishment. It's just a different benefit. We just don't want to fund that. I don't think that the court's cases have gone quite that far. If you look, for example, at the speech cases where the state says we won't fund religious speech or speech from a religious viewpoint. This isn't a forum. I agree. I'm merely drawing an analogy to those cases to explain why the burden on the individuals cannot be justified by the antiestablishment interests that the state has asserted. And I think even when there are some religious elements and some secular elements mixed in, to the extent the state is denying the benefit for the secular elements, there is a burden. Because what the state is saying is as long as you are teaching math, science, and English, you still don't get the tuition for that if in addition to those you also do some religious things at the school. That's where the burden comes in. And that's where we have to weigh the state's antiestablishment interests under the current precedents, and that's something that the state can't do. Before you sit down, in your brief, if I read it right, you don't seem to mention the footnote in Trinity Lutheran that limits it. Do you agree? Am I right about that, that you just didn't mention that footnote? I don't recall our having mentioned that footnote. That's right. So the footnote's pretty significant. I at least want some analysis by the Solicitor General of the United States as to the significance of that limitation. So could you offer us the view of the government as to what we are to make of that footnote and what the actual holding of Trinity Lutheran is, particularly because you're aware of the law of the circuit doctrine, and we can't deviate from you unless there is a court case that actually decides something that requires us to. So the issue of what Trinity Lutheran actually held is obviously directly relevant to this case, but you don't seem to address it. The footnote states that the court did not address religious uses, and we're not contending that the court needs to address religious uses in this case. We've rested our argument on religious status. So to that extent, the footnote isn't even pertinent to our argument. There is the other part of the footnote that talks about playground resurfacing. Now, that part of the footnote should be read in the context of the rest of the opinion. The rest of the opinion states that discrimination on the basis of religious status is odious to our Constitution. I don't think the footnote can plausibly be read to suggest that the court was saying that that discrimination is odious to our Constitution on the playground and not odious off the playground. Rather, the footnote is describing what the circumstances before the court in that case were. But does the footnote do anything other than place playground resurfacing in the same category as police protection and fire protection and so on? No, I don't think that would be the right way of reading the footnote. Rather, the court announces its principles in the opinion. Those principles are applicable in other cases. And the footnote explains that the result that the court has calculated under those principles is what they've calculated in the context of playgrounds. Courts still have to apply those same principles in other contexts. And maybe that leads to different results, maybe not. But the relevant principles still control in those other settings. Good morning, or maybe it's afternoon by now, Your Honors. May it please the Court, my name is Sarah Forster. I'm an Assistant Attorney General from the State of Maine. And I'm here representing Maine's Commissioner of Education, Pender Makin. Before we can even start talking about Trinity Lutheran, its footnote, and what, if anything, it does to the ULIT decision, as Judge Selya mentioned, there is a very significant standing issue here. And, as we must acknowledge, it was not briefed, it was not argued, it was not a part of ULIT. We spent a lot of time in our papers and before the court talking about third-party standing. We did not talk about redressability. And the Supreme Court has made clear that article III jurisdiction is dependent, in significant part, upon whether or not the plaintiffs, if successful, can get the benefit that they want from this court. Can I ask you about that? Because I'm a little puzzled as to what we're supposed to focus on for that purpose. In Northeastern Florida Chapter of Associated General Contractors, here's what the court says there. When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained, you don't even have to allege, that he would have obtained the benefit but for the barrier in order to establish standing. The injury, in fact, in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. Is there any reason for a free exercise claim to be different than that? It's not that a free exercise claim is different, Your Honor. That case, like the Bakke case, like many, many other cases, doesn't put the plaintiff to the nearly impossible burden of showing that but for discriminatory conduct, they would receive the benefit. They don't have to allege anything about obtaining it. That's right. But that's not the problem. Because equal treatment is the problem. Why isn't it the same here? There is a benefit. They are being treated, they claim, unequally with respect to that benefit. Then with respect to redress, the redress is to reduce the equal treatment. It's not to get them into the school because the injury comes from the equal treatment itself, just like in the contractor case. But it's not like the contractor case because in this case, the regulated entity are the schools, not the parents. And so the ability of the parents to get what they wish. You say that the regulated entity is the school, but the complicating factor here is it is a benefit to the individual, right? It's the student who gets the money. Actually, no, it's the school that gets the money. Well, but only if the student chooses for the money to go to the school, right? If the school desires and participates in the program, they get the money directly from the local school administrative unit, if that is the choice of the parent. But, Your Honor, this is no different than the Eastern Kentucky Rights case cited in our brief. The issue was the regulation of the hospitals, yet it was indigent individuals who were claiming they were entitled to care. And the court said very clearly that plaintiff's burden The question is whether that is the right analogy as to case, or whether because this is a benefit case, it should be seen differently. In other words, if what is being made available is money to students, and they are being denied equal treatment in their ability to utilize that money, then it seems much more like the contractor case than the indigent rights case that you're identifying. But it's not because there's no Supreme Court case that says if it's an individual benefit case, we can... That's for an Eastern contractor. You don't have to allege whether you get it. Because the equal treatment restricting your use of the benefit is the constitutional problem that gives you injury in fact. But it doesn't give you redressability. But the redressability is to remove the equal treatment. That's all you need. Once you remove the equal treatment, then the injury in fact is redressed. And that could be done here by simply invalidating the sectarian requirement. But it can't. Because invalidating the sectarian requirement in no way determines whether or not the student will get the benefit. In order for the student to get the benefit, a regulated entity, a school... It removes the unequal treatment. I have no other way to explain it, Your Honor, that the court has drawn a distinction between direct discrimination, college admissions. I believe that the college has an unequal admissions policy. It discriminates against women. I don't have to prove that I would be accepted to the college. You don't have to allege it. No. But that's not this case. They're alleging, and of course in a moment we'll talk about what the benefit is here, and how they're not being treated differently with respect to it. But at most, there's a third party that has to be involved in the resolution of this matter. This is the third time in 20 years we've been here. And not once has any religious school participated. They have never said they would take the benefit. And in this litigation, we actually deposed the two schools that the parents were seeking. And both of them said, we can't agree that we're going to take the benefit now. We're going to wait and see what happens, and maybe we'll consider it. It's the plaintiff's burden in these cases to produce that it is likely, and not merely speculative, that the third regulated party will do it. On your theory, then, the state of Maine could pass a statute that says that none of this money may be used for a majority-minority school. And that could not be challenged. Unless they could show there was a majority-minority school. But if they couldn't show there was a majority-minority school, what would be the point of the lawsuit? The point of the lawsuit would be to invalidate a statute which denied them a benefit based on a racial categorization. But the courts exist to resolve active controversies. And if there is no active controversy, in other words, there is no such school, then what would be the Article III basis? The same as it is in Northeastern Contractor, when they don't even have to allege that there is any ability for them to get the contract. But in that case, it's clear that there were contracts to be gotten. Not that they could get, because they didn't allege it. But there were contracts that existed. And here we don't have a sectarian school that exists, that will agree that absent this statute, we will take the money. Anyway, I'm sure that what you're actually very interested in this case is everybody's reaction to Trinity Lutheran. And we would like to state... Just one more point on standing, because it does matter. There's definitely a contingency aspect, even in Hewlett, to the standing issue, because we acknowledged when we said that there was standing, and we had to have thought about all dimensions of standing, because that's on us to figure out. We cited all of the prongs of standing, including addressability. We acknowledged that there was a contingency to the standing question, because it was not evident that any of the schools would participate, precisely because they might be subject to restrictions that they wouldn't want to comply with. That's why we rejected third-party standing in the case. The difference here, as I see it at least, is that there is a particular restriction that's been identified, that the schools have said, unless that restriction is removed, or it somehow doesn't apply, they will not participate. We don't know for sure whether that restriction does or does not apply. There's a dispute about it. Does the fact that there's a contingency about whether that restriction does or does not apply make cases like JBEC and the like come into play, such that there's still a possibility that, absent the sectarian restriction, they might be able to have a school that would participate? That's definitely a part of it. And that's why, in these cases, it's important to look at what is actually out there in the realm of possibility. The commissioner bore no burden with respect to standing, yet she demonstrated by deposing the schools and studying the statutes that apply that they are not likely to participate, and no other school stepped forward. The question is whether it's possible that they would. Is that enough? I'm sorry? The question is, if it's possible that they would, is that enough? You said it's not likely. That might be true. But is that the right standard for determining standing? The standard is they must show it's likely and not merely speculative, Your Honor. Was it likely that they would be able to have gotten standing in Hewlett? That they would have had a school that would participate? We didn't say that. No, but, Your Honor, it never came up. It never came up. None of these cases were in the briefs. It never came up, Your Honor. We're as guilty as any. So, Trinity Lutheran happened, and that is, according to counsel, the reason why they've come back to you. And our response is, yes, but what does that mean with respect to Hewlett? So, first, let's be clear. Hewlett dismisses the free exercise claim, the speech claim, and the equal protection claim, and nothing in Trinity Lutheran speaks to any of those claims. So that is all off the table. It's the law of the circuit. Trinity Lutheran speaks to a free exercise claim. And here's the thing. Trinity Lutheran says, in the most narrowest of terms, that when it comes to nonreligious use of funding, it is constitutionally impermissible to discriminate based on religious status. The Missouri situation was very clear. Churches need not apply. They left in place, undisturbed, Locke versus Davey. And Locke versus Davey, and to be clear, Mr. Davey is the gold standard where beliefs, actions, he's the whole package. He wants to devote his life to becoming a minister. But he wasn't discriminated against because he was religious. He was discriminated against because nobody, religious or not, got the tuition benefit. And your honors, in Maine, under our tuition program, nobody, religious or not, has the right to a publicly funded sectarian education. They simply don't. And so whether or not the plaintiffs, the parents in this case, who truly testified that it was important to them for religious reasons, or whether it's a single mother who wants to send her son to a Catholic school to instill discipline, none of them receive a sectarian education. It has nothing to do with whether or not they are religious. The other thing about Locke is that Locke identifies certain interests that raise heightened Establishment Clause concerns. And what could be a more perfect example of this than the state's public education? Maine's law court, which has never been referenced or mentioned by the plaintiffs, has been very clear what the purpose of the tuition program is. It is a simple vehicle to allow students who live in small towns who cannot have their own school to access a public education. That's it. And as this court in Hewlett explained, the benefit being offered is a secular education. Given that, and given the incredible footnote in Trinity Lutheran, certainly we always say as lawyers, oh, but that case is limited to its facts. This case said it was limited. Then we don't believe that anything has happened here  If your honors have no further questions. I have just one last one on standing. In Northeastern Florida chapters, Associated General Contractors, right after they make that equal benefit point, they quote from Turner v. Fooch, which says, we may assume this is a restriction on the ability of a person to serve on the Board of Education. On racial grounds. We may assume the plaintiffs have no right to be appointed to the Board of Education. But they do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory qualifications. Disqualifications. So why isn't that the same logic here as I understand their claim? Which is that there is a restriction, they claim, religiously based, hostile to the religious beliefs they have. And whether or not they actually would be able to get into any school, they can't use the benefit simply for that reason. Because the question is not whether or not they're able to get into any school. The question is whether or not any school, even if the law were changed, would offer... But isn't that the same as in Turner? The person wasn't qualified, they assumed, for the Board of Education. So getting rid of the restriction would have no effect at all. Your Honor, I don't see how that squares with the line of cases cited in our brief where each time, even though they're claiming an individual right to something, they get diverted by the concept that there is a third party being regulated. Because those are all cases in which the third party is regulated. Not direct regulation of the party seeking standing. And here the claim is the student is being directly regulated by the restriction on the money she would like to use. But that's not what's happening here. That's not what's happening here at all. The student has the choice of all of the schools that are in the tuition program in the same way that a non-religious student who wants to participate in the tuition program has a choice of all the schools. Now both these students, the parents here, children, and that other child may want to go to one of the Christian schools. But the issue is they can't unless one of those schools agrees to participate in the program. They're being treated equally, all students. Everybody gets the choices. The issue is a regulation on the schools that has caused them not to participate. As I understand the main program, the school actually has to fill out, I may have the wrong terminology, a qualification questionnaire. They have to fill out a piece of paper and file it with the commissioner of education in an effort to get the Department of Education to say, you qualify for these tuition reimbursements if the students apply to your school. But doesn't the student have to act first? In other words, the way I understood it was the student chooses the school, and then in order for the school to get the money, the school has to qualify. Not as if the schools just jump out and say, I'd like to qualify first. Is that how it works? Yes, Your Honor. The way this has worked in practice over the past 20 years is that schools apply annually to the commissioner of education to be included on the list of public schools that are available to receive public tuition dollars. If you haven't applied and a student selects you, what then happens? So every once in a while, sometimes even in the middle of the school year, we will get an application from a school because a student that's already enrolled there happens to be in a tuitioning town. And so, yes, we will process it in the middle of the year. But I want to be very certain that you understand that there's no legal requirement as to which has to come first. That hurts you potentially, right? I don't know that it has really anything to do about it, because the reality is we've had 20 years' worth of time here and no school has ever fought exclusion. It hardly ever comes up, Your Honor. I'm sorry. If there's nothing else, I think. Well, my time is not up, so if there's anything else. I have one other question. Certainly, Your Honor. Not on this jurisdictional issue, but another question about main practice. And that is, do you represent to this court that the statement of Commissioner Hassan, which has been alluded to, represents the position of Maine about the manner of administering the statute? Yes, Your Honor. If it had changed when the administration changed last year, we would have, of course, filed a supplemental statement. Okay. In conclusion, Justice Souter, writing in dissent, when we're talking about the Zellman case and a voluntary tuition program, talked about the sort of three layers of evolution of the doctrine with respect to tuition and benefits in public education and said Zellman, he was writing in dissent, was possibly a fourth layer. This case is a fifth layer and possibly a seventh or an eighth layer. This is a case that says to the state of Maine, potentially, you cannot have a public education system unless you include sectarian instruction in it. I'm sorry to stop you, but one last question occurs to me before you sit down in the minute or so that you have left. Given your representation to Justice Souter, it does at least implicate one argument that is made that wasn't referenced at all by your opponents here, which is an entanglement concern insofar as you do inquire into the content of the instruction. So could you just address why that, either because of law of the circuit under Hewlett or on the merits or both, why there's no entanglement problem given that that's how you administer the provision? I would say both, Your Honor, both under Hewlett, but also think of it in the counter way. If we could not even ask whether or not they engaged in sectarian instruction, it would essentially be an unenforceable statute in that it would rely solely on the representations of entrusted parties. And so there is no prohibition, there is no entanglement issue when the government attempts to determine whether or not something is sectarian or secular. The entanglement problem, which is very real in this case, is if they become a part of the public education system, having the Commissioner of Education, the Attorney General, or any other state official overseeing how they teach. Thank you. Thank you very much, Your Honor. I have two points. On standing, we're up here on a stipulated record, and that stipulated record is very clear that prior to 1980, students received the tuition benefit and used that benefit at religious schools. And the record is clear that after the sectarian exclusion was adopted in 1980, at least one religious school shut its doors and stopped operating. I think it's very clear based on that that if the sectarian exclusion were eliminated, as the district court recognized, there's certainly the possibility that other sectarian schools will come forward and be willing to participate in the program, particularly under the circumstances like my friend from the state mentioned, where a student attending the school might bring to the school's attention that they might be eligible. Number two, I want to explain why I believe we are not in the lockbox, but we are in the Trinity Luther box. This court in Hewlett gave Trinity Law a very broad reading, but that reading was cabined by Trinity Lutheran. The Supreme Court in Trinity Lutheran was clear that the first step of the analysis is to determine how far the program itself goes towards including religion. And the court noted that in Lockheed Davy, the program itself went a long way to including religion because promised scholars could use their scholarships to attend religious schools and even to pay for devotional classes in theology. The only thing they couldn't do was to pursue a degree that would lead to them leading a congregation. That was the sort of religious training that was at issue in Locke. And what the Supreme Court said in Trinity Lutheran is because the program went a long way towards including religion, there was no hostility towards religion, and therefore the state only had to demonstrate a substantial and historic interest in order to justify the exclusion of that one limited narrow category of training. But that's not what's going on here. Sectarian schools are prohibited from accepting the tuition from parents in total. That puts us in the Trinity Lutheran box. Your Honor, as I've said,  an injunction preventing that sort of discrimination will alleviate our client's harm. We therefore ask that you would reverse the district court's judgment and remand the case with instructions to enter an injunction against Section 2951-2 and prevent the state from discriminating on the basis of religion in the context of a generally available benefit program. Thank you. Thank you.